Feeney, Chief U.S. Bankruptcy Appellate Panel Judge.
Catholic School Employees Pension Trust (the "Pension Trust" or the "Trust") appeals from the bankruptcy court's Opinion and Order (the "Dismissal Order"), dated March 13, 2018, dismissing the Pension Trust's chapter 11 case. In dismissing the case, the bankruptcy court ruled that the Pension Trust was not a "person" eligible to be a debtor under 11 U.S.C. § 109 because it was not a "business trust" under § 101(9)(A)(v).[1] For the reasons set forth below, we AFFIRM the Dismissal Order.
INTRODUCTION
The Pension Trust administered and managed the Catholic Schools of the Archdiocese of San Juan Pension Plan (the "Pension Plan" or "Plan") which was terminated in June 2016.[2] Prior to the commencement of the Pension Trust's bankruptcy case, hundreds of Pension Plan participants (identified in the Pension Plan as employees) had commenced actions against The Holy Catholic Apostolic Roman Church, the Archdiocese of San Juan, the "Superintendence" [sic] of Catholic Schools of the Archdiocese of San Juan, the Pension Plan, and various other entities and individuals, including the current president of the board of trustees of the [28] *639 Pension Trust, Dr. Ramón A. Guzmán Rivera ("Dr. Guzmán"), in courts of the Commonwealth of Puerto Rico and the U.S. District Court for the District of Puerto Rico to recover unpaid pension benefits, as well as other forms of relief. Seeking a breathing spell from this litigation, the Pension Trust filed a chapter 11 petition on January 11, 2018.[3]
On February 6 and 7, 2018, motions to dismiss the chapter 11 case were filed by Yali Acevedo, on her own and on behalf of 180 plaintiffs in a case before the Court of First Instance, San Juan; Francisco Abreu, on his own and on behalf of six other plaintiffs in a case before the Court of First Instance, Aguadilla; and Edda D. González-Vázquez, a plaintiff in a case before the U.S. District Court for the District of Puerto Rico (collectively, the "Appellees"). The Appellees, who are participants under the Pension Plan, asserted that the Pension Trust was not a "person" eligible for bankruptcy relief because it was not a "business trust" under the Bankruptcy Code.[4] They alleged that the Pension Trust did not engage in "income generating activities" or "business activities" and, therefore, was not a business trust eligible for relief under the Bankruptcy Code. The Pension Trust opposed the motions to dismiss, claiming, among other things, that it was a business trust because it had attributes of a corporation and engaged in business activities. According to the Pension Trust, the court needed to consider the "totality of the circumstances," including the terms of the Pension Trust document, the business activities in which the Trust engaged before the Pension Plan was terminated, and the economic landscape that led to its financial decline. The Pension Trust likened its post-termination activities to those an insolvent corporation would undertake in liquidating its assets in a chapter 11 bankruptcy case and stated that the bankruptcy case was commenced "specifically to effectuate the orderly liquidation of the business trust." (emphasis in original).
The bankruptcy court scheduled an evidentiary hearing on the two motions to dismiss and, in a pre-hearing order, identified the "key legal issue" in determining the Pension Trust's eligibility as "whether the Pension Trust is a business trust." After the evidentiary hearing, at which the only witness was Dr. Guzmán, the president *640 of the Pension Trust's board of trustees, the bankruptcy court dictated into the record its findings and rulings and granted the motions to dismiss, indicating that it would issue a written decision at a later date. That written decision was the Dismissal Order in which the court determined that the Pension Trust was not a business trust and, therefore, was ineligible to be a debtor. Noting that the Bankruptcy Code does not define the term "business trust" and that no uniform standard has developed in the case law in the First Circuit and elsewhere, the bankruptcy court determined the relevant factors for evaluating whether an entity is a business trust are: (1) "whether the trust was created for the purpose of carrying [on] a business, as opposed to the preservation of the res "; (2) "whether the trust has the attributes of a corporation"; (3) "whether the trust engages in business-like activities"; and (4) "whether the trust has a profit motive." See In re Catholic Sch. Emps. Pension Tr., 584 B.R. 82, 87 (Bankr. D.P.R. 2018) (citations omitted). The bankruptcy court did not engage in a detailed analysis of each of these factors, but ruled that the Pension Trust was not a business trust.
BACKGROUND [5]
I. Pre-Bankruptcy Events
A. The Establishment of the Pension Trust and the Pension Plan
The Pension Trust was established on November 26, 1979 by a Deed of Trust. The Pension Plan was attached to, and incorporated into, the Deed of Trust. The Settlor of the Pension Trust was the Superintendent of the Catholic Schools of the Archdiocese of San Juan (the "Settlor" or the "Superintendent"). The Settlor also was denominated in the Pension Plan as its "Sponsor." Pursuant to the terms of the Pension Plan, the Settlor was responsible for the appointment of a "Retirement Committee" (hereinafter sometimes the "committee") of at least seven members who would be "under the control and direction of the Settlor and be accountable to it [sic]." Pursuant to the Pension Plan, the Settlor also was responsible for the appointment of trustees to take possession of Plan property.
The Deed of Trust incorporates by reference defined terms in the Pension Plan. The Pension Plan defines the term "Participant" as "any employee or their beneficiaries of a participating employer who has acquired or may acquire rights in the plan," and the term "Beneficiaries" as "the person or persons, natural or juridical [sic] designated to receive any benefits payable pursuant [to] this document upon the death of the participant," as well as "each and every one of the beneficiaries or heirs after the death of the participants."[6] The term "Participating Employer" is defined as follows:
( [i] ) the Office of the Superintendent of Catholic Schools of the Archdiocese of San Juan and any school that is under the supervision of the Superintendent and chooses to participate in the plan, *641 (ii) any successor to the property of any of them, (iii) any other Catholic school under the supervision of the Superintendence [sic] of their respective diocese or superintendence [sic] of Catholic schools that assumes in writing the obligation of this plan, and (iv) any agency and/or branch office of the Catholic Church of Puerto Rico, but in each case subject to the approval of the plan sponsor or their successor [sic].
The Pension Plan provides that it was created by the Superintendent "for the exclusive benefit of the employees of the participating employers and/or their beneficiaries," and that "[u]nder no circumstances shall any trust property be used or any contribution made by the employer[s] under the terms of this plan for purposes other than the exclusive benefit of the employees and their beneficiaries ...."[7] It also provides that it applies "to current and future employees of participating employers."
The Deed of Trust provides that "the Trust shall consist of such funds as shall from time to time be deposited with the Trustee by the Settlor and its employees in accordance with the term of the Plan ...." The Pension Plan in turn provides that: "The custody and control of all the assets constituting part of the fund shall be held by the trustee[s] and neither the Settlor nor any participant shall have any property right on it [sic], except that participants are entitled to receive those payments and distributions that are set forth herein." Thus, a board of trustees (hereinafter sometimes the "trustees" or the "board") administers the Trust and oversees its compliance with the terms and conditions of the Deed of Trust and the (now terminated) Pension Plan. The Deed of Trust requires the trustees to discharge their duties with respect to both the Trust and the Pension Plan "solely in the interest of the participants and their beneficiar[ies]."
B. The March 2016 Termination of the Pension Plan
Article 18 of the Pension Plan contains provisions relating to its termination and the liquidation of assets of the Pension Trust. It provides:
A. The Settlor reserves the right to terminate this plan in its entirety at any time, for any reason, or no reason at all subject to the previous approval of the Secretary of the Treasury, and/or the Pension Benefit Guarantee Corporation, as well as the majority of participating employers.
B. This termination shall be effective if the committee and the trustee[s] receive a termination permit from the Secretary of the Treasury. In such case, each participant shall take possession of all rights, title and interests of accrued benefits acquired under the plan as provided in Section D of this article.
C. The trustee shall execute each and every one of the legal documents required to achieve the termination of the trust as provided herein.
D. When the termination of the plan has been approved, the plan trustees shall proceed to liquidate the trust fund and to apportion the assets in accordance *642 with the priorities established by the regulations of Title IV of ERISA ....
If the assets available for distribution are not sufficient to cover all claims within one of the established priorities, these funds will be prorated and distributed equitably....
On March 14, 2016, Plan participants were informed that pension payments would cease as of June 30, 2016,[8] and, in fact, payments did cease. Unlike the Pension Plan, there was no evidence or argument that the Pension Trust was ever terminated.
As noted above, following termination of the Pension Plan, hundreds of Plan participants (including the Appellees) filed complaints against the Pension Trust and other entities, including, inter alia, the Archdiocese of San Juan, in various local and federal courts seeking to recover pension payments allegedly owed as well as other forms of relief.[9]
II. The Bankruptcy Case
A. The Motions to Dismiss and Opposition
On January 11, 2018, the Pension Trust filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On February 6, 2018, Ms. Yali Acevedo and Mr. Francisco Abreu, on their own and on behalf of other plaintiffs in cases in the Puerto Rico courts, filed a motion to dismiss the chapter 11 case, asserting that the Pension Trust was ineligible to be a debtor in a bankruptcy case because it was not a "business trust" under § 101(9)(A)(v).
Ms. Edda D. González-Vázquez also challenged the Pension Trust's eligibility to file a bankruptcy petition by filing a motion to dismiss the case. She maintained the Pension Trust could not be considered a business trust because it was "not created for a business purpose," had "no ongoing income generating activities," and because its formation document "prohibit[ed] the transferability of [ ] beneficial interests."
On February 20, 2018, the Pension Trust filed a single opposition to both motions to dismiss, alleging that it was a "business trust" and squarely fell within the definition of a "corporation" set forth in § 101(9)(A)(v).
Thereafter, the Appellees filed a response to the Pension Trust's opposition raising additional arguments, including: (1) the Pension Trust was "legally prohibited" from conducting further business upon termination under Article 18(D) of the Pension Plan; (2) the Pension Trust "neglected its duty to distribute the funds among the employees"; and (3) the Plan's termination was "illegal" because the Trust did not *643 "obtain the previous approval by the Puerto Rico Secretary of Treasury" as required by the terms of the Pension Plan.
B. The March 6, 2018 Bankruptcy Court Hearing
The bankruptcy court held an evidentiary hearing on the two motions to dismiss on March 6, 2018.[10] The parties introduced the Deed of Trust and the Pension Plan as a joint exhibit, and Dr. Guzmán testified. A four-part proffer of the direct testimony of Luis Carrasquillo, a certified public accountant, was considered by the court. The bankruptcy court determined that the only relevant portion of the proffer was Section D, in which Mr. Carrasquillo concluded: "In my opinion, the Trust has all the attributes of an insolvent corporation eligible for bankruptcy relief." The bankruptcy court remarked, however, that Mr. Carrasquillo offered no facts to support his opinion. The court admitted the proffer into evidence but gave it little weight.
1. Testimony of Dr. Guzmán
Dr. Guzmán was the sole witness to testify. He testified that he was appointed as a member of the board of trustees in 2011 and was elected president in 2012. He described his duties and responsibilities as president as organizing and presiding over meetings, preparing minutes and agendas, receiving information from the Plan administrator, communicating with other board members, recommending candidates to become members of the board, and participating in board determinations regarding the administration of the Pension Plan and its assets.
(a) Financial Difficulties
Dr. Guzmán testified that at the time he became president of the board, the Pension Trust was experiencing financial difficulties, particularly with respect to the "investment" of Pension Plan funds, as the fund was a "limited fund" which only received contributions from "participating employers." In practice, the Pension Trust would turn over its funds to an investment company and, according to Dr. Guzmán, "the worst problem [the trustees] had to face was the matter of the investment of the funds of the [P]lan." According to Dr. Guzmán, the Pension Trust had invested funds with "UBS" "for more than ten years," but it "had to leave UBS." He stated: "[W]hat UBS was really doing was bleeding us because they were charging us commissions for all the money that the fund invested." Dr. Guzmán testified that, following numerous meetings, the board decided to withdraw funds from UBS and transfer them to Popular Securities, where the board believed it could obtain "safer profits" at less cost. The Pension Plan experienced further financial hardship, however, due to a significant decline in the number of participating employers making contributions to the Plan. Dr. Guzmán testified that, although the Pension Plan previously had about 76 participating employers, mostly Catholic schools, that number had decreased to 43 due to school closings. He added that participating employers were precluded from withdrawing from the Pension Plan, but "the reality is that schools have shut down and disappeared as participating employers."[11]
*644 (b) Employees
Dr. Guzmán testified that during his tenure as president, the Pension Trust had two employees. One was a full-time plan "administrator" whose primary responsibilities were to "control [ ] the payments" made to and by the Plan and "bill participating employers" for their contributions. The other employee was a part-time administrative assistant who was responsible for preparing all necessary forms and submitting them to the appropriate government agencies. Dr. Guzmán testified that these employees were "paid with the funds of the plan itself; that is, from the revenues that the fund receive[d] from participating employers[.]"
(c) Termination of Plan
Dr. Guzmán also testified about the "termination" of the Pension Plan. When asked whether "the plan terminated in March 2016," he responded: "Exactly." He stated that "the participating employers [we]re ... the only ones who can decide whether the plan will continue or be closed" and that, after holding two meetings, the participating employers "decided to terminate the plan."[12] As a result of the termination, payments to beneficiaries under the Plan ceased in June 2016. He stated, however, that notwithstanding the termination of the Plan, the board of trustees continued its efforts to collect the contributions still owed by participating employers. He also testified that, although the Pension Trust received no "new contributions" after termination, the trustees successfully collected some of the accounts receivable.
(d) Trustees' Duty to Invest
Dr. Guzmán testified that the board of trustees had a duty "to invest and reinvest the trust['s assets]" and it was his understanding that "[the board] had to invest to make the fund grow." He testified that the trustees were to "discharge [their] duties with respect to the funds of the trust with diligence and prudence" and that "business be conducted to achieve the objectives of the trust."
(e) The Bankruptcy Filing
Dr. Guzmán, while admitting a lack of familiarity with bankruptcy, opined that the Trust was insolvent and, in his words "broke," and that the filing of a bankruptcy petition was the most "equitable" way to "divide up" the assets remaining in the Pension Trust and distribute them to the Pension Plan beneficiaries. He also indicated that the trustees' efforts to distribute the remaining funds to the beneficiaries were thwarted due to litigation commenced by beneficiaries, and because "a group of plaintiffs [we]re carrying out an attachment of the funds of the plan[.]"
(f) Cross-Examination
On cross-examination, Dr. Guzmán admitted that the Pension Trust had no "inventory of goods for sale," "machinery or equipment for manufacturing," "real estate," or "intellectual property." He testified that the Trust's only assets were approximately $ 1.6 million-consisting of "money contributed by the participating employers" and "dividend[s] and/or interest[ ]"-and approximately $ 1.7 million in *645 "accounts receivable"-representing amounts still owed by participating employers. He stated that the Pension Trust has a board of trustees, but it does not have any stockholders and it pays no dividends. It does not have any loans from third parties or lines of credit. Dr. Guzmán agreed that, under the terms of the Plan, participants and beneficiaries cannot "assign [ ]or transfer, encumber in any way, [or] dispose of any of the benefits to which that person is entitled[.]"
Dr. Guzmán confirmed that, pursuant to the Deed of Trust and the Pension Plan, "the obligation of the trustee[s] would be to receive the monies from the sponsoring employers, to deliver the monies to the investment company, and from that money in the investment companies, or accounts, to pay the beneficiaries and participants of the plan."
He testified that the Trust was a "not for profit" organization, that the only "original source of income" was from employer contributions, and that the trustees were responsible for the "administration" of the Trust funds. He stated that the "purpose" of the Trust was to "preserve" Trust funds, and "to make it [sic] grow," so that there would be "money [ ] there to pay" benefits to employees and the Trust's operational expenses. Dr. Guzmán agreed that the trustees' main obligation was to "receive monies from the sponsoring employers, to deliver the monies to the investment company, and from that money in the investment companies, or accounts, to pay the beneficiaries and participants of the [P]lan[.]" He rejected the suggestion that the Trust was akin to an "estate trust" or an "inheritance estate."
2. Pertinent Provisions of the Deed of Trust and Plan[13]
(a) Contributions from Participating Employers
To "finance" the Pension Plan, participating employers paid contributions to the trustees. Specifically, under the Plan, the participating employers agreed to "contribute the necessary funds through [sic] the trustee[s] for the operation and administration of the [P]lan, and that these funds should be part of the trust property, which will be maintained and managed by the trustee[s] for the benefit of employees and their beneficiaries[.]" The Pension Plan required all participating employers to make contributions as calculated by the committee and provided that those contributions were to be made "to accumulate the necessary reserves to cover monthly pension expenses that are payable to participants" of the Plan.[14] The amounts contributed by the participating employers were to be "used solely and exclusively by the [Pension Trust] for exclusive purposes for the benefit of participants and/or beneficiaries." The participants did not contribute to the Pension Plan.
(b) The Pension Trust's Assets
The assets of the Pension Trust were mainly the contributions made by participating employers under the terms of the Pension Plan, but also could include, according *646 to the Plan, "income, interest, dividends, profits, earnings or donations of any kind which became Trust property."[15]
Article 13 of the Pension Plan, entitled "Establishing the Trust," provided that the trustees would hold "custody and control of all the assets" of the Pension Trust and "neither the Settlor nor any participant shall have any property right on it [sic], except that participants are entitled to receive those payments and distributions" in accordance with the Pension Plan.
(c) The Board of Trustees
The Pension Trust is governed by a board of trustees, which is tasked with "manag[ing], invest[ing] and reinvest[ing] the Trust" pursuant to its terms and "mak[ing] payments of benefits from the Trust ... pursuant to the instructions of the Retirement Committee ...."[16] Article III of the Deed of Trust, entitled "Powers of Trustees," directs that all of the trustees' actions shall be taken "by majority" vote. It also mandates that the trustees "discharge their duties" with respect to the Pension Trust and the Pension Plan "solely in the interest of the participants and their beneficiar[ies]," "with the care, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character with like aims."[17]
(d) Power to Invest
The Deed of Trust requires the trustees to make investments on behalf of the Pension Trust. It provides:
The Trustees shall invest and reinvest the Trust [assets], without distinction between principal and income thereof, in such bonds, notes, debentures, mortgages, preferred or common stocks, pooled investment funds, or in such other properties real or personal, and/or securities of any kind, class, or character as the Trustee[s] may deem suitable[.]
Moreover, the trustees are required to "diversify[ ] the investment of th[e] Trust so as to minimize the risk of large losses[.]" The Deed of Trust, however, provides that the trustees will "not be liable for any loss resulting, directly or indirectly, from any action taken by them to carry out the suggestions from the Committee."
The Deed of Trust further authorizes the trustees:
To invest and reinvest the Trust Estate, to collect the income, rents, issues, profits and increase therefrom, to sell upon any terms, give options to purchase, assign, lease, exchange, convert, encumber, pledge, and mortgage; to alter and change the investment thereof from time to time at its discretion; to improve, manage, protect, subdivide, and partition any real estate forming part of the Trust; to dedicate to public use and vacate all or any part thereof; to compromise, adjust and settle all claims to or *647 against the Trust ...; to grant options to lease and to lease for any term ...; to make leases upon such terms and conditions as may be deemed by it to be proper; to renew, cancel, amend and/or extend leases and consent to the assignment and modification of any lease ...; and to vote personally or by proxy any shares of stock which may at anytime be held by it thereunder.
(e) Power to Exercise Options
The Deed of Trust authorizes the trustees to exercise options relating to bonds, stocks, and securities.
(f) Power to Participate in Reorganization of Corporation Held as Part of the Trust
The Deed of Trust permits the trustees to "become a party to any reorganization, consolidation, merger, or other capital readjustment of any corporation, the stocks or securities of which may at anytime be held as part of the Trust." The Deed of Trust and the Pension Plan do not expressly authorize the trustees to commence a bankruptcy case on behalf of the Pension Trust.
(g) Power to Enter Contracts
The Deed of Trust provides that the trustees "shall have full power and authority by contract to bind the Trust Estate without making themselves individually liable, and to perform any and all other acts which it may deem proper to carry out the purpose of this instrument."
(h) Power to Employ Professionals and Personnel
The trustees are authorized to "employ such agents, broker, attorneys ... and assistants as [they] may deem necessary or proper in the ... execution of th[e] Trust and pay reasonable compensation for such services." The Pension Plan also provides that the trustees are authorized to "hire the required personnel for the administration of th[e] [P]lan," and to pay such personnel from the Trust's funds.
(i) Limitations on Liability
The Deed of Trust authorizes the trustees to "act upon the instructions, directions, requests, and requisitions of the members of the Committee," and limits the trustees' liability in performing their duties under the Pension Trust by providing that they "shall not be liable ... except for their own negligence or willful misconduct."
(j) Prohibition from Engaging in Transactions with Disqualified Persons / Parties-in-Interest
The Deed of Trust prohibits the participating employers, the plan participants and their beneficiaries, and the trustees from engaging in certain transactions, such as any sale or lease of property or loans involving a "Disqualified Person" or "Party-in Interest."[18]
(k) Use of Assets for Exclusive Benefit of Participants
The Deed of Trust provides that "[a]t no time prior to the satisfaction of all liabilities with respect to the participants or their beneficiaries shall any part of the Fund ... be used for, or diverted to, purposes other than the exclusive benefit of the participants or their beneficiaries ...."
*648 (l) Full Power and Authority
The Deed of Trust gives the trustees "full and complete power and authority over the Trust except as herein provided as fully and to the same extent any individual might, could or would have owning similar property or securities in his own right, and the enumeration of specific powers shall not be taken to restrict general powers and authority" given in the Deed of Trust.
(m) Duty to Maintain Accounts
The trustees are required to "keep accurate accounts of all investment[s], receipts, disbursements, and other transactions [ ], and all accounts, books and records relating thereto shall be open at all reasonable times to inspection and audit by any person or persons designated by the Settlor." In addition, the Deed of Trust requires the trustees to submit quarterly reports to the committee, and file annual "independent certified written account[s]" with the Settlor and the committee.
(n) Disbursement of Funds
The Deed of Trust provides: "For purposes of paying reasonable expenses of the [P]lan and [T]rust associated with benefits funded under the [P]lan, the trustees shall make such payments at such times to such persons and in such amounts as the Committee shall direct in writing." The trustees, however, are not required "to determine whether any directions issued to it by the committee are in accordance with the terms of the [P]lan, [and] may follow such directions without question."
(o) Participant Acquired Rights
The Pension Plan includes provisions governing the eligibility of employees to participate in the Plan, their entitlement to benefits, their ability to designate beneficiaries, and the disbursements of pension benefits. Article 11 of the Plan is entitled "Participant Acquired Rights," and provides that "[e]mployee participation in the [T]rust shall cease" when the employee's employment ceases for any reason other than "retirement before normal retirement age," except for certain situations.
(p) Non-transferability of Benefits
Both the Deed of Trust and the Pension Plan prohibit the transfer or assignment of any benefits. The Deed of Trust at Article VIII provides:
No interest in this Trust or any share thereof shall be assignable in anticipation of payment either by voluntary or involuntary act or by operation of law, or be liable in any way for debts or defaults of any participant or beneficiary of the [P]ension [P]lan ...; and every attempt at assignment or other disposition of any cash or property in this Trust, or any part thereof, except as herein authorized, shall be void. The Trustees shall not pay any money or assign any property payable or distributable to, or standing to the credit of, any person here under to any assignee or creditor of such person.
Article 5 of the Pension Plan is entitled "Alienation, Transfer or Assignment of Benefits," and subsection A specifies:
With the exception of any amount that might be owed to the employer or to the trustee[s] [neither] the participant[s] nor any of their beneficiaries shall be entitled to assign, transfer, encumber or in any way dispose of any benefit (either principal or interest) that they may be entitled to under this [P]lan .... If any participant or any beneficiary attempts to assign, transfer, or otherwise dispose of such right ..., such right shall be transferred to one or more persons appointed by the retirement committee among the beneficiaries, spouse, and relatives of the participant or beneficiary, in such proportion as the committee determines.
*649 Under Article 6 of the Pension Plan, entitled "Designation of Beneficiary," the "committee may reassign the participant or beneficiary rights at any time, or make them to be destined for their own use, or to receive any payment that is due. The committee may revoke for just cause any appointment made under this section."
Neither the Deed of Trust nor the Pension Plan defines the scope of a beneficial interest of a Plan participant or beneficiary, other than to say that such interests are not transferable.
(q) Right to Terminate and Requirements upon Termination
Article VII of the Deed of Trust sets forth the "Duration and Termination of Trust." It provides:
This Trust shall continue for such time as may be necessary to accomplish the purpose for which it was created; but may be terminated and discontinued for reasons beyond the control of [the] Settlor. Notice of such termination shall be given to the Trustees by an instrument in writing executed by the Settlor ... and shall take effect as of the date of the delivery of such notice to the Trustees.
Upon termination of the Trust, "the Trustees shall upon the direction of the Committee[,] liquidate the Trust as promptly as possible and shall distribute the assets thereof remaining in the Trust Fund to or for the benefit of participants or beneficiaries of the Plan as directed by the Committee."
Finally, the Deed of Trust provides:
Upon termination of the Plan and liquidation and distribution of the Trust assets, in no event shall any of the Trust assets be returned to the Settlor or participating employers except such amounts as may remain after satisfaction of all liabilities with respect to participants and beneficiaries under the plan and result solely from an erroneous actuarial computation.
C. The Bench Ruling and the Dismissal Order
Throughout the hearing, the bankruptcy court made it clear that it considered the sole dispositive issue before it to be whether the Pension Trust was a business trust. It stated that the issue of whether "the [P]lan was validly terminated" was "irrelevant to the ultimate decision because what is more critical is whether or not the debtor is a business trust[.]" After hearing closing arguments from the parties, the court issued a bench ruling setting forth the positions of the parties, a summary of the testimony presented, the applicable law, and the court's application of the law to the facts of this case. The court ultimately concluded: "The debtor trust is not a business trust, and thus, is ineligible to file a bankruptcy petition. Case is dismissed." After the hearing, the court issued a "minute entry" memorializing its ruling.[19]
On March 13, 2018, the bankruptcy court entered the Dismissal Order granting the motions to dismiss and dismissing the petition as the Pension Trust "does not meet the definition of a corporation in § 101(9)(A)(v)." In re Catholic Sch. Emps. Pension Tr., 584 B.R. at 88. In the Dismissal *650 Order, the bankruptcy court concluded that the Pension Trust's "[a]llegations and proffers concerning the economic reasons which prompted the filing of the bankruptcy petition, as well as the effect that the filing had on pending actions before the Puerto Rico courts and the U.S. District Court for the District of Puerto Rico," were not "relevant to the eligibility issue." Id. at 83. Rather, the court stated, "[t]hese allegations are aimed at determining whether the petition was filed in 'good faith,' that is, to preserve and maximize assets for the benefit of creditors of the estate." Id. The court determined that it did not need to delve into this "fact intensive analysis as the eligibility issue [wa]s dispositive of the determination on whether or not the bankruptcy petition should be dismissed." Id. It reiterated that determination, stating that the Pension Trust's allegations about its financial difficulties and its purported purpose for filing the petition did not serve as a basis for determining the Pension Trust's eligibility to file a bankruptcy petition. Id. at 85. The court found that the allegations suggested that the Pension Trust "was not conducting business activity but preserving the trust funds to allocate the same to the beneficiaries upon termination." Id. (emphasis added). Accordingly, the court granted the motions to dismiss because the Pension Trust did not meet the definition of a corporation in § 101(9)(A)(v). Id. at 88.[20]
POSITIONS OF THE PARTIES
I. The Pension Trust
The Pension Trust argues that the bankruptcy court erred in ruling that the Trust was not eligible to file for bankruptcy. It claims that the bankruptcy court: (1) incorrectly found that the purpose of the Trust was solely to preserve the res , instead of maximizing it; (2) failed to consider evidence that showed the Trust has the attributes of a corporation and was created for the purpose of carrying on a business operation to maximize its funds; (3) failed to consider the financial hardships that had a detrimental effect on the Trust's business activities; and (4) only considered the time period after the Pension Plan was terminated, rather than examining the totality of the circumstances, including the "decades of business activities that the Pension Trust engaged in prior to termination." The Pension Trust does not challenge the standard articulated by the bankruptcy court for determining whether the Pension Trust is a business trust. Rather, it alleges that all of the factors identified by the bankruptcy court were satisfied and that the bankruptcy court gave undue consideration to the alleged "lack of transferability of assets." Based on the foregoing, the Pension Trust asks that "the Dismissal Order be revoked."
II. The Appellees
The Appellees counter that the bankruptcy court correctly ruled that the Pension *651 Trust was not a business trust. According to the Appellees, the Pension Trust is not a business trust because it was not created for a business purpose and is not engaged in any business activities. They claim that the "passive act of sitting on a corpus consisting of invested moneys" cannot be considered a business activity, and that Dr. Guzmán's testimony confirmed that the Pension Trust "was, at best, an investment vehicle for the [P]ension [P]lan up until June 2016." They also assert that the Pension Trust cannot be a business trust because the Deed of Trust "prohibits the transferability of the beneficial interests." This is significant, they claim, because the Internal Revenue Code (which sets forth the characteristics of a business trust for federal tax purposes) "lists transferability among the six elements it uses to characterize a trust as a business trust." According to the Appellees, the Pension Trust is "nothing more than a 'wasting asset' irreversibly declining in value as a function of time." They ask us to affirm the Dismissal Order as the Pension Trust does not qualify as a business trust entitled to bankruptcy relief.
JURISDICTION
"Pursuant to 28 U.S.C. §§ 158(a) and (b), the Panel may hear appeals from 'final judgments, orders, and decrees[.]' " Fleet Data Processing Corp. v. Branch (In re Bank of New Eng. Corp.), 218 B.R. 643, 645 (1st Cir. BAP 1998) (citing 28 U.S.C. § 158(a)(1) ); see also Bullard v. Blue Hills Bank, --- U.S. ----, 135 S.Ct. 1686, 1692, 1695, 191 L.Ed.2d 621 (2015) (discussing the Panel's jurisdiction to hear bankruptcy appeals under 28 U.S.C. § 158(a) ). "An order dismissing a chapter 11 case is a final, appealable order." Andover Covered Bridge, LLC v. Harrington (In re Andover Covered Bridge, LLC), 553 B.R. 162, 170 (1st Cir. BAP 2016) (citing In re Colón Martinez, 472 B.R. at 143 ). Thus, the Dismissal Order is final and we have jurisdiction to hear this appeal.
STANDARD OF REVIEW
When considering a bankruptcy court's dismissal of a bankruptcy case, the Panel reviews the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Jeffrey P. White & Assocs., P.C. v. Fessenden (In re Wheaton), 547 B.R. 490, 496 (1st Cir. BAP 2016) (citation omitted). A bankruptcy court's determination as to whether there is cause for dismissal under § 1112(b) is a conclusion of law subject to de novo review. See Prometheus Health Imaging, Inc. v. U.S. Trustee (In re Prometheus Health Imaging, Inc.), 705 F. App'x 626, 627 (9th Cir. 2017) (citation omitted). In addition, "[e]ligibility determinations under § 109 involve issues of statutory construction and conclusions of law, including interpretation of Bankruptcy Code provisions, which [appellate courts] review de novo." Free v. Malaier (In re Free), 542 B.R. 492, 495 (9th Cir. BAP 2015) (citation omitted). "De novo review means that the appellate court is not bound by the bankruptcy court's view of the law." Wiscovitch-Rentas v. Villa Blanca VB Plaza LLC (In re PMC Mktg. Corp. ), 543 B.R. 345, 354 (1st Cir. BAP 2016) (citation omitted) (internal quotations omitted).
DISCUSSION
I. Cause for Dismissal under Chapter 11
Section 1112(b)(1) provides that, after notice and a hearing, the bankruptcy court "shall ... dismiss a case under this chapter ... for cause ...." 11 U.S.C. § 1112(b)(1). The Bankruptcy Code sets forth several examples of "cause" to dismiss a chapter 11 case. See 11 U.S.C. § 1112(b)(4). However, the "causes" identified *652 in the Bankruptcy Code are not exhaustive and courts have recognized other grounds for the dismissal of a chapter 11 petition. OneUnited Bank v. Charles St. African Methodist Episcopal Church of Bos., 501 B.R. 1, 7 (D. Mass. 2013), aff'g 478 B.R. 73 (Bankr. D. Mass. 2012) ; see also In re Colón Martinez, 472 B.R. at 144 (stating that the court may dismiss a case "for reasons that are not specifically enumerated in the section, provided that these reasons are sufficient to demonstrate the existence of cause") (citation omitted) (internal quotations omitted). "One such cause is the ineligibility of the entity for debtor status." OneUnited Bank, 501 B.R. at 7.
A. Eligibility Under § 109
A determination of a debtor's eligibility to file a bankruptcy petition begins with § 109. Section 109(a) provides that only a "person" or "municipality" may be a debtor under the Bankruptcy Code, see 11 U.S.C. § 109(a), and § 109(d) provides that "[o]nly a ... person that may be a debtor under chapter 7 of this title ... may be a debtor under chapter 11[.]" 11 U.S.C. § 109(d) ; see also Brady-Morris v. Schilling (In re Kenneth Allen Knight Tr.), 303 F.3d 671, 673 (6th Cir. 2002). Therefore, only a "person" may be a chapter 11 debtor. In re Kenneth Allen Knight Tr., 303 F.3d at 673. Under the Bankruptcy Code, "[t]he term 'person' includes individual, partnership, and corporation," 11 U.S.C. § 101(41), and the term "corporation" includes a "business trust," but not other types of trusts. 11 U.S.C. § 101(9)(A)(v). "The legislative history underlying the Code's definition of 'corporation' makes clear that, except for a 'business trust,' a trust is not a 'person' eligible for bankruptcy relief." In re Gurney's Inn Corp. Liquidating Tr., 215 B.R. 659, 660 (Bankr. E.D.N.Y. 1997) (citing In re Medallion Realty Tr., 103 B.R. 8, 10 (Bankr. D. Mass. 1989), aff'd, 120 B.R. 245 (D. Mass. 1990) ). Thus, for a trust to be eligible to file a bankruptcy petition, it "must qualify as a business trust." In re Gulfcoast Irrevocable Tr., No. 12-06338-ESL, 2012 WL 6005716, at *2 (Bankr. D.P.R. Nov. 30, 2012). Conversely, "[i]f the debtor [trust] is not a business trust, then it is not eligible to file a bankruptcy petition." Id.
B. Time for Making Eligibility Determination
Several courts have stated that the relevant date for making a determination of eligibility under § 109 is the petition date. See TD Bank, N.A. v. Landry, 479 B.R. 1, 7 (D. Mass. 2012) ("The beginning of the bankruptcy case is the logical point to establish (to the extent reasonably possible) the debtor's and creditor's rights."); In re Northshore Mainland Servs., Inc., 537 B.R. 192, 201 (Bankr. D. Del. 2015) (stating that the relevant date for making a determination of "place of business" eligibility requirement under § 109(a) is the petition date); In re Rivers, 466 B.R. 558, 566 (Bankr. M.D. Fla. 2012) (stating that means test determination as to whether granting relief under chapter 7 would be an abuse "should be made as of the petition date") (citations omitted); In re Moore, 359 B.R. 665, 671 (Bankr. E.D. Tenn. 2006) (stating that for purposes of the 180-day period under § 109(h)(1), "[e]ligibility is determined as of the filing of the petition"); In re Global Ocean Carriers Ltd., 251 B.R. 31, 37 (Bankr. D. Del. 2000) (stating that under § 109(a), "[t]he test for eligibility is as of the date the bankruptcy petition is filed"). Therefore, "[a] debtor's eligibility for bankruptcy relief under [§] 109 is determined by facts as they exist at the time the bankruptcy petition is filed [.]" In re Myers, No. 07-14565bif, 2007 WL 2428694, at *3 (Bankr. E.D. Pa. Aug. 22, 2007) (emphasis added) (refusing to consider *653 post-petition occurrences when determining debtor's eligibility to file chapter 7 petition); see also De Jounghe v. Lugo Mender (In re De Jounghe), 334 B.R. 760, 768 (1st Cir. BAP 2005) ("Generally, eligibility for Chapter 13 is based upon debts as of the petition date and not upon post-petition events such as allowed claims, filed claims, or treatment of claims in a confirmed Chapter 13 plan."). None of these courts considered whether a trust was a business trust for eligibility purposes, and there are no cases which expressly rule that some period of time other than the petition date is the relevant date for assessing eligibility to file a chapter 11 petition. Indeed, the "fundamental principle of bankruptcy law" is that the petition date is "a key date for the determination of both debtors' and creditors' rights." In re Rivers, 466 B.R. at 566. There is no compelling reason to depart from the general rule that eligibility, like entitlement to exemptions, should be determined as of the petition date. See, e.g., Brown v. Sommers (In re Brown), 807 F.3d 701, 708 (5th Cir. 2015) (stating that "debtor's eligibility for a state law exemption under § 522 is determined by the facts and law in existence on the [petition] date").
C. Burden of Proof
Generally, a party seeking dismissal of a case has the burden of proof. See In re Charles St. African Methodist Episcopal Church of Bos., 478 B.R. at 83 (stating when an entity is considered a corporation under state law, a presumption arises in favor of the debtor that the entity is a corporation for purposes of § 101(9) and the burden of proof is on the party seeking dismissal for cause, challenging the entity's status as a corporation). Nevertheless, debtors generally bear the burden of establishing that they are eligible for relief under § 109. See In re Visicon S'holders Tr., 478 B.R. 292, 307 (Bankr. S.D. Ohio 2012) (determining the burden is on the debtor to establish eligibility); In re Gen. Growth Props., Inc., 409 B.R. 43, 70 (Bankr. S.D.N.Y. 2009) (ruling debtor had burden of proof of establishing that trust was eligible).[21] The case law is not entirely consistent, however, as another court has utilized a shifting burden of proof, requiring the movant to make a prima facie showing that the trust is not a business trust, but imposing the ultimate burden of persuasion on the debtor. See In re Gulfcoast Irrevocable Tr., 2012 WL 6005716, at *3.
The bankruptcy court in this case utilized the approach it articulated in Gulfcoast, stating in its bench ruling: "I think that the movants have made a prima facie case, and I agree with you, it's debtor's ultimate burden to establish that the debtor is a business trust, eligible to file bankruptcy under a Chapter 11." The case law regarding the burden of proof as to eligibility of business trusts is sparse. We conclude that the burden shifting approach utilized by the bankruptcy court appropriately balances the competing interests of the party seeking dismissal and the debtor seeking the protections and remedies available under the Bankruptcy Code, particularly where determination of eligibility is a fact-intensive inquiry and dependent upon circumstances unique to each case.
D. What Constitutes a Business Trust
There is consensus among courts that no uniform standard exists to define what constitutes a "business trust"
*654 for purposes of the debtor's eligibility under § 109(a). Murphy v. Bernstein (In re Dille Family Tr.), No. 17-24771-JAD, 598 B.R. 179, 191-92, 2019 WL 826568, at *10 (Bankr. W.D. Pa. Feb. 20, 2019). Although some courts determined that an entity is a business trust based upon state law, "[a] competing, more extensive, and generally more persuasive body of law has relied on the need for national uniformity and vindication of the federal bankruptcy policy to fashion a definition of 'business trust.' " Cutler v. 65 Sec. Plan, 831 F.Supp. 1008, 1015 (E.D.N.Y. 1993) ("To hold otherwise would result in different results in different states and an entity would be eligible for relief in one state but not in another. Clearly this is not what Congress intended when it enacted Article I, § 8, Cl. 4 of the Constitution, which provides that 'Congress shall have the power ... to establish ... uniform laws on the subject of bankruptcies.' ") (quoting In re Arehart, 52 B.R. 308, 310-11 (Bankr. M.D. Fla. 1985) ); see also In re Dille Family Tr., 598 B.R. at 192, 2019 WL 826568, at *10 (citing Field v. Mans, 516 U.S. 59, 70 n.9, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) ); In re Kenneth Allen Knight Tr., 303 F.3d at 679 (concluding that "the definition of 'business trust' properly belongs to federal, rather than state, law"); In re Sung Soo Rim Irrevocable Intervivos Tr., 177 B.R. 673, 676 (Bankr. C.D. Cal. 1995) (calling the "availability of access to the federal bankruptcy courts and the availability of bankruptcy relief itself" a question of "federal, not state, law"). Nevertheless, "a trust's failure to qualify as a 'business trust' under state law may be evidence of the settlor's intent that the trust not operate as a business trust." In re Dille Family Tr., 598 B.R. at 192, 2019 WL 826568, at *10 (citing In re St. Augustine Tr., 109 B.R. 494, 496 (Bankr. N.D. Fla. 1990) ; In re Treasure Island Land Tr., 2 B.R. 332, 335 (Bankr. N.D. Fla. 1980) ).
Although there is consensus that federal law should govern the determination of eligibility for trusts, a standard definition of the term "business trust" remains elusive. In 1989, the Honorable James Queenan observed that "[t]he decisions are sharply, and perhaps hopelessly divided[.]" In re Medallion Realty Tr., 103 B.R. at 10. That observation remains true today, as different tests have been formulated by various courts, although "nearly all courts look to the underlying trust instrument for guidance." In re Dille Family Tr., 598 B.R. at 192, 2019 WL 826568, at *11 (citing Cutler, 831 F.Supp. at 1015 ).
Three different approaches are evident from the case law, subject to various permutations. These approaches can be summarized as "the primary purpose" test, the multi-factor test, and a six-factor test derived from a Supreme Court tax case. See David S. Jennis and Kathleen L. DiSanto, Trust or Debtor: You Decide, 32 Am. Bankr. Inst. J. 34 (2013). Before considering these approaches, a review of pertinent case law from the First Circuit is warranted as the bankruptcy court fashioned its test with reference to several decisions from the U.S. Bankruptcy Court for the District of New Hampshire.
1. Case Law within the First Circuit
The U.S. Court of Appeals for the First Circuit has not formulated a test for defining business trusts for eligibility purposes, but bankruptcy courts in the First Circuit have been in the forefront when considering the issue.[22]
*655 (a) Medallion Realty Trust
No discussion of business trusts would be complete without reference to In re Medallion Realty Trust. In that frequently cited case, Judge Queenan set forth relevant history pertinent to the issue of what constitutes a business trust. He stated:
The unadorned term "business trust" first appeared in a proposed new bankruptcy act which was part of the Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, 93d Cong., 1st Sess. Part II at 27, (1973). The Commission subsequently filed its proposal as a bill in both houses of Congress, thus commencing the legislative process which culminated in the Bankruptcy Reform Act of 1978, P.L. 95-598, 92 Stat. 2549. The Commission's report contains these statements:
The reference at the end of the definition to a "business trust" eliminates the requirement of the present Act that beneficial interest or ownership "be evidenced by certificate or other written instrument." The requirement gives undue significance to an evidentiary formality. In construing the term "business trust" the courts may be expected to give heed to the canon of e [j]usdem generis. Cf. Pope & Cottle Co. v. Fairbanks Realty Trust, 124 F.2d 132 (1st Cir. 1941).
This explanation does not appear in any later legislative history. It is clear from the later history, however, that except for a "business trust" a trust is not a "person" eligible for relief. Both the House and Senate Committee Reports state: "The definition [of "person"] does not include an estate or a trust ..." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 313 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 25 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5810, 6270.
....
The bankruptcy law of this country, unlike that of England, has always barred estates from relief in bankruptcy. 1 Collier on Bankruptcy, § 4 at 200 (13th ed. 1923). Under both the Bankruptcy Act of 1867 (14 Stat. 517) and the Bankruptcy Act of 1898 (30 Stat. 544) the courts construed the word "person" in the eligibility provision to exclude estates. In re Fackelman, 248 F. 565 ( [ ] S.D. Cal. 1918) ; Adams v. Terrell, 4 F. 796 ( [ ] W.D. Tex. 1880). As explained in Adams v. Terrell, a principal reason for doing so was the view that state probate law provides an adequate framework for the administration of insolvent estates. The continued use by Congress of the word "person" in the law's eligibility provision indicates Congressional agreement with this reasoning. In denying general eligibility to trusts, Congress presumably viewed trusts, even those of the intervivos variety, as being much like estates in that they are typically enmeshed in an estate plan and are under the control of state probate courts.
A trust which is not part of a settlor's estate plan presents different considerations. A probate court is not its traditional *656 forum. Its beneficiaries are investors in a business enterprise rather than recipients of a settlor's largess. Congress obviously recognized these differences when in 1926 it amended what was then § 1(8) of the prior Act to allow bankruptcy relief for "any business conducted by a trustee or trustees wherein beneficial interest or ownership is evidenced by certificate or other written instrument." This opened the door to the traditional Massachusetts business trust. Because of the restrictive language, eligibility continued to be denied to a trust whose creating instrument was the only document evidencing beneficial ownership. E.g., Pope & Cottle Co. v. Fairbanks Realty Trust, 124 F.2d 132 (1st Cir. 1941). The Commission's Report ... makes it clear that the Commission viewed this documentary requirement as a needless technicality.... The failure of Congress to spell this out further in a committee report seems inconclusive in comparison to the wording of the statute itself. That it chose to make such a change is sufficient indication of a purpose to broaden the types of trusts which can qualify. In re Treasure Island Land Trust, 2 B.R. at 332. That purpose is consistent with the general statutory framework which liberalized eligibility in other contexts. In re Tru Block Concrete Products, Inc., 27 B.R. 486 (Bankr. S.D. Cal. 1983).
In re Medallion Realty Tr., 103 B.R. at 10-11 ;[23] see also GBForefront, L.P. v. Forefront Mgmt. Grp., LLC, 888 F.3d 29, 40 (3d Cir. 2018) (stating that the "primary point of distinction is ... that a traditional trust exists as a fiduciary relationship and not as a distinct legal entity" and a "general distinction between traditional and business trusts is that a traditional trust facilitates a donative transfer, whereas a business trust implements a bargained-for exchange") (citations omitted).
According to the court in Medallion, the distinction between trusts "created for the purpose of carrying on some kind of business or commercial activity for profit and those created to preserve the trust res ," while helpful, presented "too fine [a distinction] for practical application[.]" 103 B.R. at 11 (citations omitted). In Medallion, for example, the court concluded that: "Congress intended to permit bankruptcy relief for all trusts which are created for the purpose of transacting business and whose beneficiaries make a contribution in money or money's worth to the enterprise, without regard to whether the trust has characteristics of a corporation such as separate certificates of ownership." Id. at 11-12. Nevertheless, because the trustee of the trust acted as agent of the holders of a majority of the trust's beneficial interests, the court determined the debtor was actually a partnership operating under the name of the trust. Id. at 13.
(b) New Hampshire Bankruptcy Cases
Turning to the New Hampshire cases upon which the bankruptcy court below relied, In re Gonic Realty Trust, 50 B.R. 710 (Bankr. D.N.H. 1985), is noteworthy as the first in a series of cases in which the Honorable James Yacos considered whether a trust qualifies for bankruptcy relief as a business trust. In that case, Judge Yacos recognized that the decisions uniformly hold that a trust must, at a minimum, "be found to be 'conducting a business' of some kind." Id. at 713. He determined, therefore, *657 the relevant inquiry to be whether the trust "was actually operating a business in the commonly accepted meaning of such activity." Id.
In In re Woodsville Realty Trust, 120 B.R. 2, 4 (Bankr. D.N.H. 1990), Judge Yacos added the requirement that a business trust must also have at least some of the attributes of a corporation to qualify as a bankruptcy debtor. He determined that a nominee trust lacked the indicia of a corporation because the beneficiaries controlled the trustee; the beneficial interests were not transferable; there was a fixed termination date; and there was an absence of any outside "investors." Id. at 5. Moreover, he stated:
My decision in In re Gonic, supra, may be read as conflicting with my present conclusion because there I stated that the Code's deletion of the Act's reference to trusts "wherein beneficial interest or ownership is evidenced by certificate or other written instrument," Bankruptcy Act § 1(8), meant that "the lack of transferable shares by numerous beneficiaries is no longer a relevant factor for decision." [50 B.R.] at 713. That was an overstatement. Transferable certificates are no longer relevant, but transferability per se is still relevant to the concept of an entity akin to a "corporation" for federal Bankruptcy Code purposes.
Id. at 5-6.
In In re BKC Realty Trust, 125 B.R. 65, 69 (Bankr. D.N.H. 1991), Judge Yacos imposed an additional requirement for a trust to be a business trust-that it must have been "formed primarily for a business purpose." The trust in that case was created for the purpose of giving a family gift to beneficiaries who contributed no capital and were closely related to the trustee. Citing Pope & Cottle Co., supra, in which the First Circuit held that business trusts involve "unincorporated associations of persons joining together at least in part for some common business or commercial purpose, and conducting their affairs somewhat after the pattern of corporations," the court added the requirement that, in order for a trust to be a business trust, it must be established for a business purpose. Id. at 66-67 (emphasis added). The court noted that "the beneficiaries made no contribution of capital" and that the "express purpose of the trust [wa]s to hold land in the family." Id. at 67 (citing Pope & Cottle Co., 124 F.2d at 133 (noting that the named beneficiaries did not "contribute capital for the business to be conducted") ). Although the trust generated some income, the secondary purpose of the trust "was to generate 'gift' income for the beneficiaries." Id.
Because the First Circuit has not adopted a specific test, the three approaches referenced above, see supra at 654-55, assist in the determination of whether the bankruptcy court erred in the test it formulated. Those approaches can be better understood with reference to decisions relying upon a test fashioned by the United States Supreme Court in Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935),[24] as well as to decisions from the Second and Sixth Circuits.
*658 2. The Six-Factor Test - Morrissey v. Commissioner
The six-factor test set forth in Morrissey v. Commissioner was utilized by the court in In re Mosby, whose decision was affirmed by the Eighth Circuit. See 61 B.R. at 638. The court in Mosby set forth the characteristics for determining a business trust articulated by the Supreme Court, observing:
It is well established that a business trust is something more than simply a trust that carries on a business. Hecht v. Malley, 265 U.S. 144, 44 S.Ct. 462, 68 L.Ed. 949 (1924). The distinguishing characteristics of a business trust include:
1. a trust created and maintained for a business purpose;
2. title to property held by trustees;
3. centralized management;
4. continuity uninterrupted by death among beneficial owners;
5. transferability of interests; and
6. limited liability.
Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935). Essentially, Congress included business trusts in the Bankruptcy Code definition of a corporation as a person because of their similarity to corporations. See, Associated Cemetery Management Incorporated v. Barnes, 268 F.2d 97 (8th Cir. 1959).
In re Mosby, 61 B.R. at 638.
3. The Multi-Factor Approach - In re Secured Equipment Trust
The U.S. Court of Appeals for the Second Circuit considered the issue of what constitutes a "business trust" for purposes of debtor eligibility in In re Secured Equipment Trust, 38 F.3d at 89. It utilized the multi-factor approach for determining whether a trust created to serve as a vehicle to facilitate secured financing was a "business trust." Id. These factors are: (1) whether the trust at issue has attributes of a corporation; (2) whether it was created for the purpose of conducting a business or whether it was created "to protect and preserve the res "; (3) whether the trust engages in "business-like activities"; (4) whether the trust "transact[s] business for the benefit of investors"; and (5) whether there is "the presence or absence of a profit motive." Id. at 89-90 ; see also In re Blanche Zwerdling Revocable Living Tr., 531 B.R. 537, 542-43 (Bankr. D.N.J. 2015) (applying multi-factor test articulated by the Second Circuit). The Second Circuit espoused "a very fact-specific analysis of the trust at issue," focusing on "the trust documents and the totality of the circumstances, not solely on whether the trust engages in a business." In re Secured Equip. Tr., 38 F.3d at 89, 90-91 (citation omitted).
4. The Primary Purpose Test - In re Kenneth Allen Knight Trust
The U.S. Court of Appeals for the Sixth Circuit adopted a "primary purpose" test in In re Kenneth Allen Knight Trust,[25] stating:
The standard consists in two propositions: first, "trusts created with the primary purpose of transacting business or carrying on commercial activity for the benefit of investors qualify as business *659 trusts, while trusts designed merely to preserve the trust res for beneficiaries generally are not business trusts"; and second, "the determination is fact-specific, and it is imperative that bankruptcy courts make thorough and specific findings of fact to support their conclusions"-findings, that is, regarding what was the intention of the parties, and how the trust operated.
303 F.3d at 680 (footnote omitted). The Sixth Circuit emphasized the absence of a requirement for transferable certificates of ownership. Id. at 676. Many courts have adopted the Sixth Circuit's "primary purpose" test, and it appears to be the preferred test in the most recent decisions. See, e.g., In re John Q. Hammons Fall 2006, LLC, 573 B.R. 881, 893-94 (Bankr. D. Kan. 2017) ("This court finds the Sixth Circuit's approach articulated in Kenneth Allen Knight Trust, and newer cases that have developed as the use of trusts has developed over the last 20 years, to be more persuasive for the task at hand.");[26] In re Rubin Family Irrevocable Stock Tr., No. 13-72193-dte, 2013 WL 6155606, at *8 (Bankr. E.D.N.Y. Nov. 21, 2013) (applying the primary purpose test); In re Jin Suk Kim Tr., 464 B.R. 697, 704 (Bankr. D. Md. 2011) (same); In re Estate of the Assignment for the Benefit of Creditors of May, 405 B.R. 443, 453-54 (Bankr. E.D. Mich. 2008) (holding that appropriate test was whether trust was created with primary purpose of transacting business or carrying on commercial activity for benefit of investors); Hughes Living Tr., 305 B.R. at 62 (holding that trust whose "primary purpose" was estate planning was not a business trust); Dayton Title Agency, Inc. v. White Family Cos. (In re Dayton Title Agency, Inc.), 262 B.R. 719, 726-27 (Bankr. S.D. Ohio 2001) (stating that main characteristic of "business trust" is that it is created with primary purpose of transacting business or carrying on commercial activity for profit; trusts which are designed merely to preserve trust res for beneficiaries fail to satisfy this definition), aff'd in part, vacated in part on other grounds, 284 B.R. 238 (S.D. Ohio 2002).
Application of the primary purpose test is not always straightforward, particularly where the trust may have been created with more than one purpose. For example, some trusts are intended to be estate-planning vehicles or to provide for the maintenance of the beneficiaries, but also authorize the trustees to invest the trust's assets. If, however, the trust was created with the primary purpose of transacting business or carrying on commercial activity, it will be deemed a business trust. See, e.g., Rubin Family Irrevocable Stock Tr., 2013 WL 6155606, at *8 ; Jin Suk Kim Tr., 464 B.R. at 704 (concluding that a trust was a "business trust" even though it was also meant to serve as an estate-planning vehicle). However, courts have held the mere fact that a trust "incidentally" conducts business or engages in some business-like activities is not sufficient to make it a "business trust" eligible for bankruptcy relief under the primary purpose test. See, e.g., Blanche Zwerdling Revocable Living Tr., 531 B.R. at 543 ; Estate of the Assignment for the Benefit of Creditors of May, 405 B.R. at 454 ; Hughes Living Tr., 305 B.R. at 62.
*660 As one court stated in the context of a family trust:
If incidental business activity can transform a family trust into a qualified debtor then the dividing line really would evaporate since almost every family trust of realty or commercial property would involve some business activity in terms of upkeep and maintenance of the property together with paying taxes and other bills until the property is to be liquidated and distribution is made to family members.
In re Westgate Vill. Realty Tr., 156 B.R. 363, 365 n.1 (Bankr. D.N.H. 1993).
5. The Dille Family Trust Test
Among courts fashioning their own tests, the court in In re Dille Family Trust recently formulated a simplified test based upon its review of the earlier tests, stating:
[W]hether a trust constitutes a valid "business trust" turns upon two generally required elements. The first is whether the trust itself was created for the purpose of transacting business for a profit (as opposed to merely preserving a res for beneficiaries). The second is whether the trust in-fact has all of the indicia of a corporate entity. If both of these items are present, then the trust at issue is more than a gratuitous or ordinary trust and is a business trust. If any one of these two characteristics is not present, then the trust is not a "business trust" and is ineligible for bankruptcy relief under Chapter 11 pursuant to 11 U.S.C. § 109(d).
598 B.R. at 194, 2019 WL 826568, at *13.[27]
6. Pension Related Cases
A number of courts have found the reasoning articulated by the New Hampshire bankruptcy court in BKC Realty Trust, 125 B.R. at 67-68, to be persuasive. Of particular note, in In re Parade Realty, Inc., Employees Retirement Pension Trust, 134 B.R. 7, 11 (Bankr. D. Haw. 1991), the court applied the three factors set forth in BKC Realty Trust, and determined that a pension trust did not constitute a business trust under the Bankruptcy Code. The Parade court identified the relevant factors as follows: (1) the trust must be actively engaged in and doing business; (2) the trust must have some of the significant attributes of a corporation, primarily the transferability of interests in the trust ; and (3) the trust must have been formed primarily for a business purpose. Id. (emphasis added). Applying these factors, the court concluded that the pension trust, which was established for tax purposes and whose trustee was also the sole beneficiary and employee, did not qualify as a business trust as it lacked attributes of a corporation, especially transferable interests, and had no outside investors. Id. The court acknowledged that its decision was "primarily because of the lack of transferability of interest[s]." Id. at 8.
*661 In another case involving pension benefits, the court determined, in the context of an employee benefit trust fund's request for a preliminary injunction, that the trust was not eligible to seek chapter 11 relief because it was "not engaged in any business activities and d[id] not generate any business profits." In re Westchester Cnty. Civil Serv. Emps. Ass'n, Inc., Benefit Fund, 111 B.R. 451, 456 (Bankr. S.D.N.Y. 1990).
In In re Affiliated Food Stores, Inc. Group Benefit Trust, 134 B.R. 215, 218 (Bankr. N.D. Tex. 1991), however, the court concluded that the self-funded employee benefit plan, administered through a third-party plan administrator, whose stated purpose was to provide and maintain health benefits for employees of member stores, qualified as a business trust. The court focused on the type of activity for which the trust was created, noting that its business activity entailed "collecting and receiving employer contributions from member stores ... and paying claims made by employees of member stores and their families ...." Id. It further stated:
The type of business activity described in the trust instrument contrasts sharply with that of donative trusts, entities traditionally excluded by the Bankruptcy Act and Code from the category of business trusts. Here Debtor's principal purpose is not effectuating a settlor's estate plan through the preservation of a trust res. The purpose of its business activity is designed to lower costs of health care coverage for the member stores. Debtor does not merely hold title to funds and attempt to preserve them for the benefit of member stores' employees. Through pooling the assessments paid by the member stores, it provides health care coverage for member stores' employees at a financial discount.... Debtor analogizes its business activity to that of a large volume purchaser of medical services, such as an HMO, which, through arrangements reached with health care providers, is able to control costs for its enrollees. The lowered health costs represent a tangible financial benefit realized by both the member stores and the Trust beneficiaries, whose claims are paid through this system.
Id. (citations omitted). Thus, the court concluded that, even though the trust did not generate a profit, it qualified as a business trust. The court also noted that there was no restriction on the transferability of the beneficiaries' interests, the trust's management was centralized, and its liability was limited to its assets on hand. Id. at 218 n.2.
As one court noted when considering the "sound reasoning" of the Affiliated Food Stores court in determining that the health care trust before it was a business trust:
Providing health care benefits to employees is a major activity of American business, involving substantial allocations of funds.
A health care trust might be likened to [a] jointly owned subsidiary of a business. It takes the place o[f] private or self-funded insurance which must be characterized as a business in nature. In fact, the expenses of insurance and health care are a major factor in many bankruptcies. The Plan and other analogous plans are founded on the belief that they are an administratively efficient method of assisting groups of employers in supplying health care benefits to large pools of employees at reduced costs. Without such collaborative practices, the already almost unmanageable costs of health care would undoubtedly be even higher. To the small employers and unions that generally take advantage of such devices, these plans are critical business arrangements.
*662 Cutler, 831 F.Supp. at 1018 (citations omitted).
Regardless of whether the primary purpose test, or some other test, is applied to determine whether an entity is eligible to be a debtor under § 109 of the Bankruptcy Code, "[t]he one overriding principle that emerges from the cases is that the determination of whether a trust is a business trust is fact-specific and focuses on the purpose and operations of the trust." Jin Suk Kim Tr., 464 B.R. at 704 ; see also Gulfcoast Irrevocable Tr., 2012 WL 6005716, at *3 ("[A] determination that a trust is or is not a business trust is fact specific and must be based on the totality of the circumstances."). Moreover, even if one of the purposes of a trust is to preserve assets for the benefit of its beneficiaries, that does not preclude a finding that the trust is a business trust so long as its primary purpose is to do business. See Rubin Family Irrevocable Stock Tr., 2013 WL 6155606, at *8-9 ; Jin Suk Kim Tr., 464 B.R. at 704 (finding a trust to be a "business trust" even though it was also meant to serve as an estate-planning vehicle because debtor continually put hundreds of thousands (at times even millions) of dollars' worth of the res at great risk in the course of chasing after profits). On the other hand, engaging in some business-like activities does not mean that the trust is a business trust. See Secured Equip. Tr., 38 F.3d at 90-91 (stating that court's "inquiry must focus on the trust documents and the totality of the circumstances, not solely on whether the trust engages in a business") (citation omitted). One commentator has summed up the case law as follows:
Courts, when dealing with a trust's eligibility for bankruptcy relief, generally focus not on how they were formed but rather on whether the trust existed solely to preserve and protect assets, whether it operates only passively, whether the trustee actually conducts business as it is ordinarily understood , whether the trust was created as a family trust for family purposes, whether control was exclusively vested in a trustee, and whether the trust's beneficiaries were investors and hence expecting a profit from operations just as in any other private business.
Robert J. D'Agostino, The Business Trust and Bankruptcy Remoteness, 2011 Ann. Surv. of Bankr. L. 4, 5-6 (2011) (emphasis added) (footnotes omitted).
Although courts examine trust documents, it is not appropriate to focus solely on the formation document to determine whether a trust is a business trust. In re Jin Suk Kim Tr., 464 B.R. at 704. Moreover, "[t]he mere fact that the trust happens to engage in business does not make it a 'business trust.' " In re Sung Soo Rim Irrevocable Intervivos Tr., 177 B.R. at 678 (citation omitted); see also In re Koch V. Hankins Judgment Creditor Tr., No. 06-02112-PHX-CGC, 2006 WL 3040765, at *3 (Bankr. D. Ariz. Oct. 24, 2006).
Given the various approaches to what constitutes a business trust, we conclude that the multi-factor approach is correct and that in future cases the distilled multi-factor approach advanced by the court in In re Dille Family Trust provides a proper, as well as a practical, standard that strikes a fair balance among factors various courts have considered. In Dille, the court stated:
A fair reading or synthesis of the case law cited above is that the riddle of whether a trust constitutes a valid "business trust" turns upon two generally required elements. The first is whether the trust itself was created for the purpose of transacting business for a profit (as opposed to merely preserving a res for beneficiaries). The second is whether *663 the trust in-fact has all of the indicia of a corporate entity. If both of these items are present, then the trust at issue is more than a gratuitous or ordinary trust and is a business trust. If any one of these two characteristics is not present, then the trust is not a "business trust" and is ineligible for bankruptcy relief under Chapter 11 pursuant to 11 U.S.C. § 109(d).
In re Dille Family Tr., 598 B.R. at 194, 2019 WL 826568, at *13.
II. Whether the Bankruptcy Court Erred in Determining that the Pension Trust Was Not a Business Trust
A. The Standard Applied by the Bankruptcy Court
Like the bankruptcy court, we consider the dispositive issue to be whether the Pension Trust is a business trust. In making that determination, the bankruptcy court employed the following factors: (1) "whether the trust was created for the purpose of carrying a business, as opposed to the preservation of the res "; (2) "whether the trust has the attributes of a corporation"; (3) "whether the trust engages in business-like activities"; and (4) "whether the trust has a profit motive." In re Catholic Sch. Emps. Pension Tr., 584 B.R. at 87 (citing, inter alia, In re Secured Equip. Tr. and the New Hampshire cases discussed above).
According to the bankruptcy court, the second factor, that the trust must have the attributes of a corporation, especially the transferability of interests, stems from the following decisions: In re Gonic Realty Tr., supra, In re Woodsville Realty Tr., supra, and In re Parade Realty Tr., supra. In re Catholic Sch. Emps. Pension Tr., 584 B.R. at 87. The court stated that it agreed with "such rationale." Id. It further stated: "A trust that is passive because 'it is not engaged in active management of assets with a goal of increasing its profitability or value'-irrespective of whether it is involved in commercial transactions-is not a business trust eligible to file bankruptcy." Id. (quoting D'Agostino, The Business Trust and Bankruptcy Remoteness, supra, at 18). The court noted that it had previously adopted this analysis in In re Gulfcoast Irrevocable Trust, 2012 WL 6005716. In re Catholic Sch. Emps. Pension Tr., 584 B.R. at 87.
B. Did the Bankruptcy Court Apply the Correct Standard?
The bankruptcy court engaged in a fact-specific analysis considering the totality of the circumstances based on the Trust documents as well as the actual operations of the Pension Trust using a four-part test. The bankruptcy court articulated the relevant factors developed from those set forth by the New Hampshire bankruptcy court in In re BKC Realty Trust, In re Woodsville Realty Trust, and In re Gonic Realty Trust, and the Second Circuit in In re Secured Equipment Trust, 38 F.3d at 90 ("[R]egardless of whether generating a profit is a necessary element of a business trust, petitioners cannot dispute that many courts have found the presence or absence of a profit motive influential in their determination of whether the trust at issue was a business trust."). Absent First Circuit authority, the bankruptcy court properly developed and applied a standard that incorporated required elements utilized by both circuit and bankruptcy courts in the *664 cases discussed above. Additionally, the standard was consistent with the two-part standard employed by the court in Dille that synthesized the existing factors used by courts engaging in a multi-factor review. The factors it utilized were warranted and useful for making a determination as to whether the Pension Trust is a business trust for eligibility purposes. The New Hampshire bankruptcy court's practical three-part test was well-reasoned, combining traditional trust principles with the less restrictive totality of the circumstances approach. Accordingly, conducting de novo review, we conclude the bankruptcy court did not err in adopting the standard used to resolve the issue of whether the Pension Trust satisfied its ultimate burden of demonstrating that it was a business trust. See In re Gulfcoast Irrevocable Tr., 2012 WL 6005716, at *3 (finding trust agreements established prima facie showing that the family trusts were designed as an estate planning purposes but affording the debtors an opportunity to present evidence to the contrary); Gurney's Inn Corp. Liquidating Tr., 215 B.R. at 660 (stating that the burden is on the trust alleging eligibility under § 109 to show that it is a business trust).
C. The Pension Trust's "Temporal Aspect" Argument
The Pension Trust challenges the bankruptcy court's determination that the Trust was not a business trust, contending that all of the factors articulated by the bankruptcy court were satisfied and the bankruptcy court erred in its analysis. It asserts the bankruptcy court erred by resting its determination on the Pension Trust's post-termination activities "rather than giving weight to the decades of business activities and business-like decision-making processes undertaken during the pre-termination period." According to the Pension Trust, the bankruptcy court imposed a "temporal constriction" in its analysis by limiting its consideration to the Trust's activities after the termination.
The Pension Trust's argument is unpersuasive for two reasons: (1) the bankruptcy court did not impose a "temporal constriction" in its analysis; and (2) regardless of whether the court looks at the Pension Trust's activities on the petition date or over the course of its existence, the Pension Trust did not qualify as a business trust at any time.
1. No "Temporal Constriction" by the Bankruptcy Court
Although the Pension Trust argues that the bankruptcy court limited its consideration to the Trust's post-termination activities, a reading of the Dismissal Order does not show that the bankruptcy court imposed the "temporal constriction" suggested by the Pension Trust. First, although the bankruptcy court did not identify every provision of the Trust documents on which it relied, it expressly stated that its decision was based on "due consideration of the [P]ension [T]rust documents, the Pension Plan, the uncontested facts as the parties presented the same to the court, and the applicable law[.]" In re Catholic Sch. Emps. Pension Tr., 584 B.R. at 87. Additionally, in concluding that the Pension Trust was not a business trust, the court reasoned that: (1) the Trust was established to secure payment to beneficiaries; (2) its purpose was to preserve the principal of the contributions made by the participating employers and the interest generated by the principal; and (3) the purpose of the Trust was not to generate a profit. Id. These determinations necessarily required the bankruptcy court to consider the Pension Trust and Pension Plan documents and the totality of the circumstances, and none of its conclusions were limited to the activities of the Trust after termination. Similarly, there is no indication in the Dismissal Order that, when *665 considering whether the Trust engaged in business-like activities, the court limited its consideration to post-termination activities. See id. Rather, the Dismissal Order reflects that the bankruptcy court considered all of the business activities identified by the Pension Trust, but concluded that they "were not corroborated by the trust deed, the pension plan, nor the testimony of Dr. Guzmán." Id. at 88. Thus, we conclude that the bankruptcy court did not improperly limit its consideration to the Trust's post-termination activities.
2. The Relevant Date for Determining the Pension Trust's Status as a Business Trust
Although there is an abundance of case law on the question of what constitutes a business trust for bankruptcy purposes, the cases do not address the "temporal aspect" of the court's determination-i.e., what is the appropriate date or time period for the bankruptcy court to consider when determining the trust's status as a business trust. Eligibility for bankruptcy relief is generally determined as of the petition date. Thus, in this case, determination of whether the Pension Trust is eligible for bankruptcy relief as a business trust does not hinge on the termination date of the Pension Plan. The pre-petition termination of the Pension Plan was not determinative of the Pension Trust's eligibility to be a debtor. The bankruptcy court, without expressly ruling, correctly determined the eligibility of the Pension Trust at the petition date as it accepted evidence of Trust activities after the termination of the Pension Plan. In re Catholic Sch. Emps. Pension Tr., 584 B.R. at 85-86.
D. Applying the Bankruptcy Court's Standard
1. The Purpose of the Pension Trust
The record reflects that the Trust was created to administer the Pension Plan and to manage, invest, and distribute assets received from participating employers in the Pension Plan. The Deed of Trust provides that, at all times, the Trust's assets are held for the exclusive benefit of the Plan participants and their beneficiaries, and the Pension Plan provides that it was created "for the exclusive benefit of the employees of the participating employers and/or their beneficiaries[.]" The Trust's assets primarily consisted of contributions from participating employers, although it also included any "income therefrom." The Deed of Trust required the trustees to make "payments of benefits from the Trust" and to pay the "reasonable expenses of the plan and trust."
There is no question that the trustees were required by the Deed of Trust to invest and reinvest the Trust's assets. The Deed of Trust provided: "The Trustees shall invest and reinvest the Trust [assets] ... in such bonds, notes, debentures, mortgages, preferred or common stocks, pooled investment funds, or in such other properties real or personal, and/or securities of any kind, class, or character as the Trustee[s] may deem suitable[.]" The trustees also were required, however, to "diversify[ ]" their investments "so as to minimize the risk of large losses[.]" Therefore, the Trust was not created for a business purpose, let alone primarily for a business purpose. Rather, the Trust documents reflect that the Trust was intended as a "passive" investment vehicle. Moreover, the trustees passively managed the Trust assets as the participant employers' contributions were invested in UBS and Popular Securities.
Dr. Guzmán testified that the Trust was a "not for profit" organization, the only "original source of income" was from employer contributions, and the trustees were *666 responsible for the "administration" of the Trust funds. He also testified that the "purpose" of the Trust was to "preserve" Trust funds, and "to make it grow," so that there would be "money [ ] there to pay" benefits to employees and the Trust's operational expenses. This testimony supports the conclusion that the purpose of the Trust when it was created was the preservation of the res so that the Trust had the funds to distribute pension payments to Plan participants when directed to do so by the committee.
The Pension Trust, of course, asserts that the Trust was created primarily for a business purpose, arguing the Deed of Trust "mandates the trustees to increase and maximize the funds 'in the conduct of an enterprise of a like character with like aims.' " According to the Pension Trust, this "clear mandate" demonstrates the "business purpose of the Trust geared towards asset maximization." While it can be inferred that the purpose of investing the Trust's assets was to increase their value through positive investments returns, nowhere in the Deed of Trust does it require the trustees to "increase and maximize" funds. In fact, the Deed of Trust requires the trustees to take a low-risk investment approach by diversifying their investments to minimize the risk of large losses. Moreover, the Deed of Trust does not require the trustees to invest " 'in the conduct of an enterprise of a like character with like aims,' " as asserted by the Pension Trust. The Pension Trust has taken the quoted language out of context. The Deed of Trust requires the trustees to discharge their duties "with the care, prudence, and diligence ... that a prudent man ... would use in the conduct of an enterprise of a like character with like aims." This does not mean the trustees were required to aggressively invest the Trust's assets with the primary goal of maximizing interest and dividends.
The cases upon which the Pension Trust relies are distinguishable from this case. For example, in Jin Suk Kim Trust, the court determined that:
[F]rom the moment of its inception, Kim managed the Debtor to maximize its profits and the value of its assets in order to enhance the overall wealth of her family. She managed it, and the real estate assets it acquired, the same way she ran her other businesses, without regard to trust principles, including traditional trust principles of prudent, diversified investment and protection of trust res.
464 B.R. at 704.
Similarly, in Rubin Family Irrevocable Stock Trust, the court held that the trust, which was established as an estate-planning vehicle, qualified as a business trust because its primary purpose was to generate profits. 2013 WL 6155606, at *8-9. In reaching this decision, the court noted that the trustees "continually put hundreds of thousands (at times even millions) of dollars' worth of the res at great risk in the course of chasing after profits" and employed a "high risk, high reward" approach to investing. Id. at *9. The court concluded:
In light of all this risk-taking with the res , it would defy reason to conclude that the primary purpose of the Trust Debtors is to 'protect and preserve' it. If the protection and preservation of the res were the Trust Debtors' primary purpose, then they would invest much more conservatively than they have done.
Id. (emphasis added).
The courts in these cases emphasized the profit-making goal of the business trust and the objective of distributing that profit to the business owners as returns on their investment. Here, the investment *667 purpose of the Trust was "incidental" to the Trust's primary purpose of collecting contributions from participating employers, and preserving those contributions for distribution to the Plan participants in the form of pension payments. Although the Pension Trust also sought to generate income, it was only authorized to do so, and, in fact, did so, by engaging in "passive" forms of investment (such as common stock or other securities, certificates of deposit, and the like), rather than in active forms of investment (like real estate development activity and high-risk investments). See In re St. Augustine Tr., 109 B.R. at 496. Indeed, as Dr. Guzmán's testimony established, the Pension Trust yielded to the expertise of UBS and Popular Securities. Moreover, "[t]he mere fact that [a] settlor intended to enhance the assets through commercial activity does not equate th[e] entity with a corporation, and [ ] bring it within the scope of § 101 ( [9] )." Id. (citation omitted). As one court noted: "The distinction, between a business enterprise trust and a [ ] trust that has incidental business activity, is that the business enterprise trust at the outset is organized by a group of investors who are seeking to not only operate a business but profit from it from the employment of their invested risk capital." In re Westgate Vill. Realty Tr., 156 B.R. at 365. That is not the case here as the participants and their beneficiaries were not investors. Indeed, they did not contribute to the Pension Plan at all.
2. Substantial Attributes of a Corporation
Courts have not articulated a uniform list of factors to consider when assessing whether a trust has substantial attributes of a corporation to qualify as a business trust. Rather, they tend to look at the specific characteristics of the trust and determine whether, based on a totality of the circumstances, the trust has a sufficient number of the attributes of a corporation. One of the most significant considerations for the court when determining whether a trust has the attributes of a corporation is "whether the trust's beneficiaries were investors and hence expecting a profit from operations just as in any other private business." See D'Agostino, The Business Trust and Bankruptcy Remoteness, supra, at 6; see also In re Woodsville Realty Tr., 120 B.R. at 5 (concluding that the trust was not a business trust because it lacked the attributes of a corporation, including the "lack of outside 'investors' ").
The Pension Trust argues that it has the following attributes of a corporation: (1) it engages in business-related activities; (2) it is governed by a board of trustees which "is akin to a Board of Directors" with "ample powers to manage and [m]ake decisions in favor of maximizing the funds for the benefit of pensioners, employers and beneficiaries"; (3) the Deed of Trust authorizes the trustees to hire personnel; and (4) the Deed of Trust limits the trustees' liability for actions taken in accordance with its terms.
As the Pension Trust asserts, the Deed of Trust reflects that the Pension Trust is governed by a board of trustees, the trustees are authorized to hire, and, in fact, hired personnel, and the Deed of Trust limits the trustees' liability. That is not, however, the end of the inquiry. The record also reflects that the Trust lacks many of the other commonly recognized attributes of a corporation. Dr. Guzmán testified that the Pension Trust has no "inventory of goods for sale," "machinery or equipment for manufacturing," "real estate," or "intellectual property." The Trust's only assets were approximately $ 1.6 million-consisting of "money contributed by the participating employers" and "dividend and/or interest[ ]"-and approximately $ 1.7 million in "accounts receivable"-representing *668 amounts still owed by participating employers. It does not have any loans from third parties or lines of credit.
Most importantly, however, the Trust is completely funded by the participating employers. There are no outside investors and the Plan participants and beneficiaries make no contributions to the Trust. The participants are not investors who contribute capital to the Trust with the expectation of receiving a return on their investment from the operation of a business. The participants and their beneficiaries do not hold anything equivalent to a stock certificate and are prohibited from transferring or assigning their beneficial rights. They are not equity investors or contributors to capital. Therefore, the Trust is more akin to a traditional trust which has been formed for the purpose of effecting, preserving, and protecting a gift or contribution, rather than a profit-generating corporation.
The Pension Trust argues that the bankruptcy court erred in giving too much "weight" to the "lack of transferability of assets" of the Pension Trust and in concluding that there was a lack of transferability. This argument is unpersuasive because it confuses the transferability of assets with the transferability of beneficial interests under the Pension Plan. The Pension Trust is correct that the bankruptcy court found that the "transferability of Trust property is limited to qualified persons," but is not entirely prohibited. See In re Catholic Sch. Emps. Pension Tr., 584 B.R. at 84 (emphasis added). But the bankruptcy court did not identify the transferability of assets as a factor in its analysis; rather, the court stated that a trust must have the attributes of a corporation, "especially the transferability of interests. " Id. at 87 (emphasis added). Both the Deed of Trust and the Pension Plan expressly prohibit the transfer or assignment of beneficial interests. Moreover, some courts have held that the transferability of beneficial interests is one of the more important attributes of a corporation that a trust must have to be considered a business trust. See In re Parade Realty Tr., 134 B.R. at 11 ; In re Woodsville Realty Tr., 120 B.R. at 5.[29]
The bankruptcy court correctly ruled that while the Pension Trust exhibited several of the attributes of a corporation, based on a totality of the circumstances, the Pension Trust did not have enough of such attributes to qualify as a business trust. Significantly, in addition to lacking capital contributions by the Plan participants and the transferability of beneficial interests, the Pension Trust lacked one of the other most important characteristics of a corporation-it did not engage in business-like activities. See *669 In re Treasure Island Land Tr., 2 B.R. at 334 (concluding that, although the trust "share[d] several characteristics with a corporation," it was not a business trust because it did not actively engage in any business activity).
3. Engages in Business-Like Activities
The Pension Trust argues that, prior to its termination, it was engaged in business activities that were consistent with "asset maximization" as evidenced by its investment of "sizeable amounts" with various "money makers" which investments were "pooled together with the Participating Employer[s'] contributions [to] maximize the Trust's assets[.]" In addition, the Pension Trust asserts that its "commercial activities" included: (1) "investing in capital markets, managing portfolios, [and] supervising investments"; (2) "keeping a payroll for regular employees for its support and routine maintenance"; (3) "conduct[ing] business which require[d] specific accounts with the IRS, Puerto Rico Treasury Department and the State Insurance Funds"; (4) "serv[ing] as an account receivable division to collect from [P]articipating [E]mployers"; (5) "invoic[ing] on a regular monthly basis"; and (6) "manag[ing] and contract[ing with] professionals such as attorneys, accountants, financial advisors, and money managers." Although the record reflects that the Pension Trust was authorized to make investments and employ professionals, and Dr. Guzmán testified that the trustees transferred money to UBS and then to Popular Securities to invest, the other asserted "commercial activities" are not supported by the testimony of Dr. Guzmán or any other part of the record.
As discussed above in connection with the "primary purpose" analysis, although the record reflects that the Trust sought to generate income by transferring funds to various investment companies, the trustees were only authorized to engage in passive forms of investment (such as the purchase of common stock or other securities, certificates of deposit, and the like), rather than in active forms of investment (like real estate development activity and high-risk investments). "The mere fact that [a] settlor intended to enhance the assets through commercial activity does not equate th[e] entity with a corporation, and [ ] bring it within the scope of § 101 [9]." In re St. Augustine Tr., 109 B.R. at 496 (citation omitted). In sum, the trustees' investment activities were insufficient to qualify the Trust as a business trust for bankruptcy purposes.
The Pension Trust also argues that the bankruptcy court erred by failing to consider the "financial hardships that had a detrimental effect on the Trust's business activities." According to the Pension Trust, the "fall of money markets had a significant detrimental effect on the Trust's business activities, further contributing to its financial hardship." These financial hardships, the Pension Trust alleges, "are clear evidence that the Trust behaved as a corporation that struggled to continue under a profitable scenario" and "clear evidence of its business nature[.]" The bankruptcy court correctly observed, however, that allegations regarding the economic reasons which prompted the filing of the bankruptcy petition are not directly related to the Pension Trust's eligibility to file a bankruptcy petition.
4. The Totality of the Circumstances
Based upon the foregoing, the bankruptcy court properly employed a burden shifting approach, placing the ultimate burden of establishing eligibility under §§ 109(d) and 101(9) and (41) on the Pension Trust. The bankruptcy court also formulated and applied a proper standard for eligibility, and correctly ruled that: (1) the Trust was not formed "primarily for a business purpose"; (2) the Trust has some "attributes of a corporation," but does not have two of *670 the most important attributes-the contribution of capital by the beneficiaries and the transferability of beneficial interests; and (3) although the Trust may have engaged in "passive" investment activities which produced gains and losses, those activities were "incidental" to the trustees' duties to preserve, protect, and distribute the trust res. The Trust documents clearly establish that the Trust's primary purpose was the preservation of the trust res for distribution to the Plan participants and Dr. Guzmán's testimony demonstrated that the Pension Trust's activities were limited to low-risk investment of the res. Based on the totality of the circumstances as reflected in the record, the Pension Trust failed to establish that it was a business trust and thus does not qualify as a debtor under the Bankruptcy Code.
CONCLUSION
The Dismissal Order is AFFIRMED.

Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific statutory sections are to the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. §§ 101, et seq.

The appellees have raised issues as to the propriety of that termination in the bankruptcy court and in several other civil actions.

We take judicial notice that the Archdiocese of San Juan filed its own chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the District of Puerto Rico on August 29, 2018 (Case No. 18-04911). See In re Colón Martinez, 472 B.R. 137, 139 n.4 (1st Cir. BAP 2012) (stating the Panel may take judicial notice of the bankruptcy court's docket) (citation omitted). In its bankruptcy case, the Archdiocese referenced a February 6, 2018 Notice of Removal it filed along with the Superintendent of Catholic Schools of the Archdiocese of San Juan in the U.S. District Court for the District of Puerto Rico (Case No. 18-01060-JAG) with respect to actions pending in the Puerto Rico Court of First Instance, San Juan Part (Consolidated Case Nos. SJ2016CV0131; SJ2016CV00143; and SJ2016CV00156). On August 20, 2018, following the dismissal of the Pension Trust's bankruptcy case, the district court in Case No. 18-01060-JAG granted the plaintiffs' motion to remand to the local court nunc pro tunc and entered judgment "retroactively applied as of March 13, 2018." The Archdiocese appealed that decision to the U.S. Court of Appeals for the First Circuit (Case No. 18-1931).

As discussed below, § 109(a) provides that "only a person ... may be a debtor," and § 101(41) provides that "[t]he term 'person' includes individual, partnership, and corporation ...." 11 U.S.C. §§ 109(a), 101(41). Under the Bankruptcy Code, the term "corporation" includes, among other things, a "business trust." 11 U.S.C. § 101(9)(A)(v). Thus, if a trust is a "business trust," it constitutes a "person" that it is eligible to file a bankruptcy petition.

The background set forth herein is gleaned from the submissions of the parties in this appeal, the undisputed facts set forth in the bankruptcy court's decision, and the bankruptcy court's docket. See In re Colón Martinez, 472 B.R. at 139 n.4.

The Deed of Trust and the Pension Plan inconsistently capitalize certain terms (including "participant," "participating employer," "committee," "beneficiary," and "trustee(s)"). For the sake of consistency, unless otherwise noted or unless quoting material from the record, this opinion will hereinafter use lower case letters when referring to those terms.

The Pension Plan provides that "[t]o the extent possible" it is to "be construed and administered in a manner consistent with the intent and requirements of the applicable provisions of the 'Employees' Retirement Income Security Act of 1974', as amended (ERISA '74) and the Income Tax Law of nineteen hundred and fifty-four (1954) of the Commonwealth of Puerto Rico, as amended ...." On July 18, 2017, however, the Supreme Court of Puerto Rico ruled that "the Pension Plan is not covered by [ERISA], since the ecclesiastical plans exemption applies under ERISA."

The record does not contain a copy of the "notice" and thus it is not clear who provided the "notice," i.e., the Settlor or the trustees. Although both the Appellees and the Pension Trust agree that the "Pension Fund was terminated" as of June 30, 2016, the Appellees claim that the "termination" was "illegal" or "invalid" because the Pension Trust did not obtain the "previous approval" of the Puerto Rico Secretary of Treasury to terminate the Plan as required by Article 11(A), (B) and (D) of the Pension Plan. As discussed below, the bankruptcy court acknowledged that the dispute as to the validity of the Pension Plan's termination was unresolved, but it concluded that the question was "irrelevant" as the dispositive issue before it was whether the Pension Trust constituted a business trust.

In its statement of financial affairs, the Pension Trust identified seven proceedings pending against it in the Puerto Rico local and federal courts. The record reflects that some of the plaintiffs have attempted to attach and foreclose assets of the Trust and/or the Archdiocese of San Juan.

Prior to the hearing, on February 22, 2018, the bankruptcy court entered an order informing the parties that the resolution of the legal issue as to the eligibility of the Pension Trust for bankruptcy relief required consideration of the trust documents and the totality of the circumstances regarding both the purpose and the operation of the Pension Trust, and directing them to submit proposed findings of fact in advance of the hearing. The Pension Trust attached to its submission, among other documents, a "certified translation" of a Judgment issued by the Supreme Court of Puerto Rico on July 18, 2017, and the Curriculum Vitae of proposed expert witness, Luis Carrasquillo, CPA.

Article 15(B) of the Pension Plan provides that "[n]o employer may withdraw from the plan.... Even in exceptional cases where a definitive withdrawal is authorized to an employer, they shall be responsible for the benefits acquired (past liability) of their employees while they were participating in the plan."

Dr. Guzmán's testimony is not consistent with Articles 15 and 18 of the Pension Plan reproduced supra at 641, 644 n.11.

The Deed of Trust and Pension Plan were admitted as a joint exhibit at the evidentiary hearing.

As noted above, the Pension Plan provided that the Settlor would appoint a committee to be known as the "Retirement Committee" to "provide routine administration of the plan" and to serve as a "communication link between participating employers and employees and/or their beneficiary(ies)." Article 24 of the Pension Plan identified six members of the Retirement Committee who were not to be compensated for their services as committee members.

Specifically, the Deed of Trust provides:
The Trust shall consist of such funds as shall from time to time be deposited with the Trustee by the Settlor and its employees in accordance with the terms of the [Pension] Plan ... which funds and any increment thereto and the income therefrom and the property for which any of the same shall be exchanged for or into which any of the same shall be converted shall collectively constitute the Trust Estate.

Both the Deed of Trust and the Pension Plan identify five "Appointed Trustees." The trustees are not compensated for their service on the board.

The trustees are also directed to "give bond, subject to Section 412 of the Employee Retirement Income Security Act of 1974."

The Deed of Trust identifies a list of "Disqualified Persons" and "Parties-in-Interest," which include the participating employers, persons who provide services to the Pension Trust, fiduciaries (such as anyone exercising control over the Trust, those who render investment advice to the Trust, and those who have discretionary authority in the administration of the Trust), the individual trustees, the members of the Retirement Committee, and the officers, directors, and employees of the participating employers.

The "minute entry" provided:
The parties argued their respective positions. Joint Exhibit 1 was submitted, the Trust Deed and its attachment the Pension Plan. Debtor presented the testimony of Dr. Ramón A. Guzmán, President of the Board of Trustees. At the conclusion of the evidentiary hearing, the court issued a bench ruling concluding that the Debtor Trust is not a business trust and that the petition be dismissed. A written opinion will follow.

The court stated:
After due consideration of the pension trust documents, the Pension Plan, the uncontested facts as the parties presented the same to the court, and the applicable law, the court concludes that the Debtor Pension Trust is not a business trust. The trust was established to secure payment to beneficiaries. Therefore, its purpose was to preserve the principal of the contributions made by the employer participants and the interest generated by the principal. The purpose of the trust was not to generate income or profit.
The business activities referred to by the Debtor were not corroborated by the trust deed, the pension plan, nor the testimony of Dr. Guzmán. The actual Pension Trust activities are only incidental to the Board [of T]rustees' responsibility of protecting and preserving the corpus or res of the trust.
Id. at 87-88.

But see Shawmut Bank Conn. v. First Fid. Bank (In re Secured Equip. Tr. of E. Air Lines, Inc.), 38 F.3d 86, 89 (2d Cir. 1994) (placing burden of proof as to eligibility on petitioning creditors in an involuntary case).

This is particularly because of the existence of "Massachusetts trusts." A "Massachusetts trust" is defined as follows:
The "Massachusetts Trust" is a form of business organization, common in that State, consisting essentially of an arrangement whereby property is conveyed to trustees, in accordance with the terms of an instrument of trust, to be held and managed for the benefit of such persons as may from time to time be the holders of transferable certificates issued by the trustees showing the shares into which the beneficial interest in the property is divided. These certificates, which resemble certificates for shares of stock in a corporation and are issued and transferred in like manner, entitle the holders to share ratably in the income of the property, and, upon termination of the trust, in the proceeds.
In re Hughes Living Tr., 305 B.R. 59, 61 n.2 (Bankr. W.D. Okla. 2004) (quoting Hecht v. Malley, 265 U.S. 144, 146-47, 44 S.Ct. 462, 68 L.Ed. 949 (1924) ).

The court also discussed the Massachusetts business trust form, stating that "in its day [it was] perhaps more in use throughout the country than is the nominee trust today. Its life span was prolonged in Massachusetts for real estate investment purposes because until recent years its rental income and distributions therefrom were exempt from Massachusetts income tax." In re Medallion Realty Tr., 103 B.R. at 13.

See Mosby v. Boatmen's Bank of St. Louis Cnty. (In re Mosby), 61 B.R. 636, 638 (E.D. Mo. 1985), aff'd, 791 F.2d 628 (8th Cir. 1986) ; In re Star Tr., 237 B.R. 827, 831 (Bankr. M.D. Fla. 1999) ; In re Margaret E. DeHoff Tr. I, 114 B.R. 189, 191 (Bankr. W.D. Mo. 1990) ; In re St. Augustine Tr., 109 B.R. at 496 ; In re Vivian A. Skaife Irrevocable Tr. Agreement No. 1, 90 B.R. 325, 328 (Bankr. E.D. Tenn. 1988) (all discussing the Supreme Court's decision in Morrissey ).

The underlying trust in Kenneth Allen Knight Trust: (1) was created by an individual using solely that individual's funds; (2) designated only the settlor and his daughters as beneficiaries; (3) gave "virtually total control" of the trust and management of trust assets to the settlor; (4) held both personal and business property; and (5) most or all of the subsidiary corporation's financial activities were conducted through the trust and the trust's bank accounts. 303 F.3d at 674-76.

The John Q. Hammons Fall 2006, LLC court went on to say:
It would be illogical to ... impose a formalistic, rigid test to define a business trust that requires transferable interests or pooled capital, because the very nature of a business trust-just like any business entity-is that it is suited to whatever particular task is at hand. The Code imposes no such rigid rule or express requirements on business trusts, and the Court will not read the requirement into the Code without a direction to do so.
573 B.R. at 894.

The court noted that other tests have been fashioned, including a test used by the U.S. District Court for the Eastern District of Pennsylvania which requires an analysis of four key elements, namely:
1. the trust was formed for the primary purpose of transacting business or commercial activity, as opposed to preserving assets;
2. the trust was formed by a group of investors who contribute capital to the enterprise with the expectation of receiving a return on their investment;
3. the trust was created in compliance with state law; and
4. the beneficial interests in the trust must be freely transferrable [sic].
In re Dille Family Tr., 598 B.R. at 193-94, 2019 WL 826568, at *12 (quoting In re Eagle Tr., No. 98-2531, 1998 WL 635845, at *5 (E.D. Pa. 1998), and citing In re Joobeen, 385 B.R. 599 (E.D. Pa. 2008) ).

The requirement is consistent with the second required element used by the court in Dille. Indeed, while the bankruptcy in Dille distilled the various factors to two, the bankruptcy court's factors merely amplified the two factors the Dille court deemed dispositive.

The Parade Realty Trust court stated:
The importance of the transferability of the interests of a business trust cannot be overemphasized. Even the Internal Revenue Code lists transferability among the six elements it uses to characterize a trust as a business trust. Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935). While transferability need not be evidenced by actual certificates, the beneficial interests in any purported business trust must be transferable. Without transferability, the trust herein fails to fall within the realm of a business trust.
134 B.R. at 11 (emphasis added); see also In re Woodsville Realty Tr., 120 B.R. at 5-6 (stating that while transferable "certificates" evidencing the beneficial interests of the trust are not required, "transferability per se is still relevant to the concept of an entity akin to a 'corporation' for federal Bankruptcy Code purposes). In any event, although the bankruptcy court identified the transferability of beneficial interests as one of the most significant attributes of a corporation that a trust must have to qualify as a business trust, the Dismissal Order does not reflect that the bankruptcy court gave that factor considerable weight in making its determination.